## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES,

     **Plaintiff**

v.                               **16cr2362 MCA**

LONNIE JACKSON,

     **Defendant.**

and

UNITED STATES,

     **Plaintiff,**

v.                               **16cr2363 MCA**

DIAMOND COLEMAN

     **Defendant.**


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants'[1] *Motion to Compel Discovery pertaining to Claim of Selective Enforcement*. [Doc. 2362:29; Doc. 2363:28] The Government responded [Doc.32], and Defendants replied. [Doc.35] After the Government provided some of the materials sought in Defendants' *Motion*, Defendants submitted a supplemental brief [Doc. 45], in which they outlined the remaining items

---

[1] The Court granted the Defendants' motion to file pleadings related to this issue jointly. [Doc. 2362:49; Doc. 2362:52] For simplicity, the Court will therefore refer hereafter to the joint pleadings filed in Case No. 16cr2362 only.

sought, and the Government responded to the supplement. [Doc.47] Defendants filed a reply as well. [Doc.52] An evidentiary hearing was held on October 30, 2017 and December 13, 2017.

The Court has considered the parties' submissions, the evidence presented at the hearings, and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS IN PART** Defendants' *Motion*.

## I. Background and Summary of Requested Information

Lonnie Jackson was indicted for distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). [Doc. 2] Diamond Coleman was indicted for distribution of methamphetamine, using and carrying a firearm during and in relation to a drug trafficking crime, and being a felon in possession of a firearm and ammunition. [Doc. 2363:2] Both Defendants were arrested during a "surge" operation in Albuquerque by the Bureau of Alcohol, Tobacco, and Firearms (ATF) in 2016. During the surge, the ATF was aided by five confidential informants, who were recruited from throughout the country. Three of the confidential informants were black and two were described as Hispanic. [12/13/17, 44:5-11] One hundred and four people were arrested as a result of the surge. Twenty-eight of those arrested are black, twelve are white, and sixty-four are Hispanic. [Def. Exh. O; Doc. 28-5; 10/13/17, 78:6-10]

Defendants seek discovery of a wide range of materials relating to the surge and to a possible claim of selective enforcement. Defendants, who are black, argue that they are entitled to these materials because they have shown sufficient evidence of discriminatory intent behind and discriminatory effect of the ATF sting. [Doc. 29]

In their original *Motion to Compel Discovery*, Defendants sought disclosure of fourteen types of information. [Doc. 29] A hearing on *Defendants' Motion to Compel Discovery* was originally scheduled for June 27, 2017. That hearing was continued on Defendants' motion so that the parties could meet and work out discovery without intervention. [Doc. 39; Doc. 40] The Government subsequently provided some of the information requested and objected to other requests. [Doc. 45-2] On September 21, 2017, Defendants filed a supplement to their motion requesting types of information which had not been provided. [Doc. 45] The Government responded. [Doc. 47]

The current information sought by Defendants is:

1. The [National Crime Information Center (NCIC)] criminal history report relied on by the ATF during the investigation of the member of the Albuquerque ATF surge defendant class, in each of the 103 Albuquerque ATF surge cases. [Doc. 45, pg. 7]

The Government argues that it has already provided pretrial services reports to the defense and that those reports should be sufficient. [Doc. 47, pg. 5] Defendants counter that they need to know what the agents knew at the time they made the decision to arrest (or not arrest) people encountered during the surge. [Doc. 52, pg. 8] The defense wants to use this information to show whether the criminal history that the ATF claims to have relied on was the deciding factor in arrest decisions, or not. [Doc. 45, pg. 10] Because Defendants already have NCIC reports for cases represented by the Federal Public Defender's office, they are requesting only the NCIC reports for defendants not represented by that office. [Doc. 45, pg. 9]

2. The address of the location where a confidential informant approached the initial target that ultimately led to the arrest of a member of the

Albuquerque ATF Surge defendant class, in each of the 103 Albuquerque ATF surge cases. [Doc. 45, pg. 10]

The Government argues that this information is immaterial and irrelevant. [Doc. 47, pg. 7] Defendants counter that the information is material because they want to know whether the location of first contact is consistent with the target area for the surge as described by the ATF. [Doc. 45, pg. 11; Doc. 52, pg. 10]

3. All NCIC criminal history reports requested or generated, related to the Albuquerque ATF Surge, by any law enforcement officer working on the Albuquerque ATF Surge, between March 1, 2016 and September 30, 2016. [Doc. 45, pg. 11-12]

Defendants argue that this information is necessary so that they can see if, for example, white individuals with criminal histories within the target criteria were identified by the ATF but not pursued. [Doc. 45, pg. 12] The Government relies on its objection to #1 above. [Doc. 45-2] It also argued at the hearing that this request is overly burdensome, presented issues with privacy, and could lead to similar requests by other defendants. [10/30/17, 15:4 – 20:9]

4. Any grant proposals and funding requests, as well as any other documents or communication, delineating the purpose and intended effect of the Albuquerque ATF Surge operation. [Doc. 45, pg. 13]

Defendants argue that they need this information to understand what ATF had in mind as the effect of the Surge and to see if ATF had instituted measures to avoid racial profiling in its operations. [Doc. 45, pg. 13] The Government argues that it did not receive any grant funding for the operation in Albuquerque in 2016, and further objects to providing funding requests as irrelevant. It asserts that it has provided any

documentation it has regarding the purpose of the ATF Surge operation. [Doc. 45-2, pg. 3]

    5. All documents and communications reflecting what, if anything, any confidential informant involved in the Albuquerque ATF Surge was told about which individuals or class of individuals to target/not to target. [Doc. 45, pg. 14]

Defendants argue that, although the ATF maintains that the confidential informants were only told which geographic area to target, it does not make sense that they were not also told which individuals to target. [Doc. 45, pg. 14] Thus, they seek any information about what the confidential informants were told about whom to target within the specified geographic area. The Government argues that it did not use individual target selection criteria, but rather focused on a geographic area. It further asserts that information about the target geographic area was disclosed already. [Doc. 47, pg. 7-8; Doc. 45-2, pg. 3]

    6. All communications between any confidential informant involved in the Albuquerque ATF Surge and any target of the Albuquerque ATF Surge, whether the target was ultimately arrested and charged or not, to include all communications from any and all phones utilized by the confidential informant, business or personal, official or unofficial, as well as all emails, text messages, voicemail messages, audio and video recordings, recorded phone calls, and social media communications. [Doc. 45, pg. 15]

Again, Defendants want to be able to compare the communications with defendants to those who were not arrested, to see if race was the deciding factor in the arrest decision. [Doc. 45, pg. 15] The Government objects to this request as overbroad and irrelevant. [Doc. 45-2, pg. 4]

7. All documents and communications . . . between any persons employed or contracted by the ATF, related to: the area of town to target, the decision to target (or not to target) anyone pursuant to the ATF Surge, the decision to pursue (or not to pursue) any target of the ATF Surge, the decision to arrest (or not to arrest) anyone pursuant to the ATF Surge; the charging criteria for the ATF Surge; the decision to charge (or not to charge) anyone as a result of the ATF Surge; and the race of any target, potential target, and/or defendant in the ATF Surge. . . . [Doc. 45, pg. 17]

The Government objects to this request as overbroad and irrelevant.  [Doc. 45-2, pg. 4]

8. All training manuals utilized in or influencing the manner of execution of the Albuquerque ATF Surge.  [Doc. 45, pg. 17]

The Government objects to this request as overbroad and irrelevant.  [Doc. 45-2, pg. 4]

9. All documents, communications, meeting notes, data, studies, and reports relied upon in selecting the so-called SE quadrant of Albuquerque as the target area.  [Doc. 45, pg. 17-18]

The Government maintains that, to the extent such materials exist, they have been provided already.  [Doc. 45-2, pg. 5]

10. All TLOxp reports requested or generated, related to the Albuquerque ATF Surge, by any law enforcement officer working on the Albuquerque ATF Surge, between March 21, 2016, and September 30, 2016.  [Doc. 45, pg. 18]

Defendants argue that this information is relevant to determining whether there were some non-black individuals who fit the target criteria but who were not pursued. [Doc. 45, pg. 19]  The Government maintains that this information does not exist.  [Doc. 45-2, pg. 5]

11. Any and all contemporaneous reports created or generated during the investigation into Yusef Casanova's white male methamphetamine supplier, to include vehicle registration reports, driver's license information, and NCIC reports. [Doc. 45, pg. 19]

The parties differ on the facts of the encounter with Mr. Casanova, and thus on what materials were generated during the investigation. [Doc. 45-2, pg. 5; Doc. 45, pg. 19]

12. All documents and communications reflecting what, if anything, any confidential informant involved in the Albuquerque ATF Surge was told about which areas of the city to target/not to target. [Doc. 45, pg. 20]

The Government maintains that this information does not exist. [Doc. 45-2, pg. 5]

## II. Discussion

## 1. The Discovery Standard

"Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and Black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). Our Tenth Circuit Court of Appeals has outlined what a plaintiff alleging selective enforcement must prove:

The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards." The plaintiff must demonstrate that the defendant's actions [1] had a discriminatory effect and [2] were motivated by a discriminatory purpose. . . . The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision. . . .

*Id.* at 1168 (citations omitted).

Here, of course, Defendants seek not to prove selective enforcement, but to obtain discovery by which they might use to make a selective enforcement claim. A defendant is not required to prove selective enforcement in order to obtain discovery related to it. *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001). ("[T]he defendants need not establish a prima facie case of selective prosecution to obtain discovery on these issues."). In *United States v. Armstrong*, the Supreme Court addressed the showing necessary to receive discovery related to a selective prosecution claim and held that the courts "require some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." 517 U.S. 456, 468 (1996) (internal quotation marks and citation omitted). The Court equated this "some evidence" standard with a "colorable basis," "substantial threshold showing," "substantial and concrete basis," or "reasonable likelihood." *Id.* (citations omitted).

The *Armstrong* Court began its analysis by noting that "[t[he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws" and that "[a]s a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* at 465 (internal quotation marks and citations omitted).

Another part of the rationale in *Armstrong* was based on the burden discovery can place on the Government and the costs of disclosure of certain types of information. *Id.* ("If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many

of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy."). Judicial deference to prosecutor's decisions hence also "stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Id.* " 'Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.' " *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). Because of the presumption of regularity and these concerns, the standard for discovery related to selective prosecution is heightened. *Id.*

The parties diverge on whether the *Armstrong* standard for obtaining discovery related to selective *prosecution* claims applies to selective *enforcement* claims.[2] [Doc. 35, pgs. 3-5; Doc. 32, pgs. 5-6] Defendants argue that "with a claim of selective prosecution, movant must contend with the presumption of regularity afforded to prosecutors [but] with a selective enforcement claim, . . . there is no presumption of regularity afforded to law enforcement officers." [Doc. 35] Defendants point to *United States v. Davis*, in which the Seventh Circuit held that

> [a]gents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors,

---

[2] A selective enforcement claim focuses on actions of law enforcement, whereas a selective prosecution claim focuses on actions of prosecutors. *United States v. Alcaraz-Arellano*, 302 F. Supp. 2d 1217, 1226 (D. Kan. 2004), *aff'd,* 441 F.3d 1252 (10th Cir. 2006) (distinguishing between the two and stating that selective enforcement focuses on "the decision and actions of the law enforcement officer, not the exercise of discretion by the prosecutor").

agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause. Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that defendants have access to material, exculpatory evidence. Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done.

793 F.3d 712, 720–21 (7th Cir. 2015) (citations omitted). The Court concluded that the

concerns animating "*Armstrong* do not apply to a contention that agents of the FBI or

ATF engaged in racial discrimination when selecting targets for sting operations, or when

deciding which suspects to refer for prosecution." *Id*. at 721.

Several courts have noted the *Davis* holding approvingly. *See, e.g.*, *United States

v. Hare*, 820 F.3d 93, 101 (4th Cir.), *cert. denied,* 137 S. Ct. 224 (2016), *reh'g denied,*

137 S. Ct. 460 (2016); *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1048 (N.D.

Cal. 2016). The Third Circuit recently stated that

we find ourselves in agreement with the core rationale of *Davis*: the special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *Armstrong* and *Bass*—and our own reasoning in our pre-*Armstrong/Bass* case law on the same subject—does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity. Prosecutors are ordinarily shielded by absolute immunity for their prosecutorial acts, but police officers and federal agents enjoy no such categorical protection.

*United States v. Washington*, 869 F.3d 193, 219 (3d Cir. 2017) (footnotes omitted), *cert.

denied,* No. 17-6986, 2018 WL 311803 (U.S. Jan. 8, 2018).

Other courts have criticized the *Armstrong* requirements, noting their seeming impossibility. The District Court of Kansas held that, in selective prosecution claims, "making a showing of a similarly situated individual is possible [because] [t]he claimant is dealing with a defined universe of individuals with whom to compare; individuals who were arrested and prosecuted for the same offenses in that jurisdiction or some other jurisdiction." *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1185 (D. Kan. 2003). In contrast, "[i]n the context of a challenged traffic stop . . . imposing the similarly situated requirement makes the selective enforcement claim impossible to prove. It would require the defendant to make a credible showing that a similarly situated individual was *not stopped* by the law enforcement. How could a defendant, *without discovery,* ever make such a showing?" *Id*. at 1186; *see also United States v. Paxton*, No. 13 CR 103, 2014 WL 1648746, at *4 (N.D. Ill. Apr. 17, 2014) (stating that "in selective prosecution claims, there should exist records of individuals who were charged and then subsequently treated in a different manner than the defendant. In selective enforcement cases, however, identifying the class of individuals is a much more burdensome endeavor, and one that may prove insurmountable" and holding that the defendants had met their burden in that case).

In *Alcaraz-Arellano*, our Tenth Circuit Court of Appeals noted that the standard for discovery related to selective prosecution claims is a "demanding" one, because "a claimant is requesting the judiciary to exercise power over a special province of the executive branch" and then noted that this standard was applied to a selective enforcement discovery request in *United States v. James*, 257 F.3d 1173, 1177 (10th Cir.

2001). *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (internal quotation marks and citation omitted). The Court echoed the concerns in *Armstrong*, stating that:

> caution is required in reviewing a claim of selective law enforcement. "[C]harges of racial discrimination ... may be easy to make and difficult to disprove." *Marshall,* 345 F.3d at 1167. Executive-branch officials possess broad discretion in determining when to make a traffic stop or an arrest. *See id.* Judicial interference with law-enforcement discretion might "induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws," such as by directing law-enforcement resources away from minority neighborhoods. *Id.* Accordingly, the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, "a demanding one." [*Id.*]

*Alcaraz-Arellano*, 441 F.3d at 1264. Thus, the Tenth Circuit concluded that

> the showing necessary to obtain discovery for a selective [enforcement] defense must itself be a significant barrier to the litigation of insubstantial claims. Although defendants seeking discovery need not establish a prima facie case of selective [enforcement], they must satisfy a rigorous standard[.] They must produce some evidence of both discriminatory effect and discriminatory intent.

*Id.* (internal quotation marks and citations omitted).

## 2. Discriminatory Intent

"Discriminatory intent can be shown by either direct or circumstantial evidence."

*Id.* Defendants argue that they have shown sufficient circumstantial evidence of discriminatory intent, and that they seek direct evidence of discriminatory intent through discovery. [Doc. 29, pg. 23]

### a. Homophily

First, Defendants argue that the ATF's selection of black confidential informants (CIs) "prefigures the selection of defendants and, in this foreshadowing, manifests the existence of selective enforcement." [Doc. 29, pg. 23] They point to the idea of "homophily," which "is the principle that a contact between similar people occurs at a higher rate than among dissimilar people." Miller McPherson, Lynn Smith-Lovin, and James M Cook, *BIRDS OF A FEATHER: Homophily in Social Networks*, Annu. Rev. Sociol. 2001. 27:415–44, *available at* http://aris.ss.uci.edu/~lin/52.pdf. Defendants maintain that, because of homophily, "for every Black 'principal' a confidential informant targeted, a web of several Black codefendants was often spun." [Doc. 29, pg. 24] The Government argues that this position is "ridiculous" because "[a]n argument that Black confidential informants will only interact with other Black confidential informants is an assumption that is itself racist." [Doc. 32, pg. 7] While it does not "deny that the ATF uses [confidential informants] that are similar in background to the criminals it tries to stop," it maintains that "the key characteristic of the selected confidential informants in the Albuquerque operation was not their race: it was their background of dealing or selling controlled substances." [Doc. 32, pg. 7]

Essentially, Defendants' argument is that ATF recruited black confidential informants when they knew or should have known that black confidential informants would interact with more black drug or firearms dealers than with dealers of other races. At the hearing, Agent Johnson and Agent Zayas testified as to how the confidential informants were selected for the operation in Albuquerque. Agent Johnson testified that

the confidential informants were "confidential informants that [the ATF had] worked with in the past, and they come from all over the country." [Tr. 10/30/17, 28:25 – 29:1; *see also* 12/13/17 43:19 – 44:25 (stating that the ATF selected "guys that have worked these kinds of operations before")] He also stated that there were no white confidential informants available at the time. [12/13/17, 44:12-15 ("Q. You did not choose to use one White confidential informant? A. I don't have any White confidential informants – or I didn't at the time.")] At the end of Agent Zayas' testimony, the Court asked him how the confidential informants were selected. [12/13/17, 108:2-3] Agent Zayas stated in response,

> I do the selection of the agents, so while I'm selecting the agents and I'm talking to individuals around the country, I'm trying to determine what confidential informants are available and then the reliability of those confidential informants. So as I'm seeking agents and I'm trying to obtain different agents to come to Albuquerque based upon their experience and their ability to work with others and all that type of thing, I'm also questioning the agents throughout the country as to their confidential informants and if those confidential informants are reliable.

[12/13/17, 108:4-14] The Court also asked whether the ATF has access to any white confidential informants. Agent Zayas stated that there are white confidential informants working for the ATF, but that selection is "just whoever happens to be available at that time that I'm able to vet, that the information comes back to me that these people are reliable." [12/13/17, 110:2-8] He went on, "For the most part, I don't even ask what their race is. It doesn't matter." [*Id*.] He also testified that he was not given any information about the composition of the Albuquerque community with respect to ethnicity or race while recruiting agents and confidential informants. [12/13/17, 109:14-22] He stated

that "[e]ach particular city has their own idiosyncrasies, but at the end of the day, firearms trafficking and narcotics trafficking is basically the same throughout the country" and that the "idiosyncrasies" of Albuquerque were its "proximity to Mexico" and the amount and quality of drugs available here as a result. [12/13/17, 111:4-17] He did not discuss how the ATF recruits confidential informants to work in particularly homogenous or insular communities.

However, Agent Johnson also testified about how some of the suspects identified during the Albuquerque operation were introduced to the ATF by other suspects. He stated that there were twenty-six instances which he called "conspiracies," which he defined as "two or more people engaged in criminal activity together that we ultimately charged" but which did not necessarily lead to conspiracy charges. [10/30/17, 31:17-19; Gov't Exh. 57] Seventy-five of the 104 surge defendants were associated with one of these "conspiracies." [Gov't Exh. 57] Agent Johnson testified about several instances in which the confidential informant met one person, who then introduced the confidential informant to another person, who ultimately provided the confidential informant with drugs or weapons. For example, he described one such transaction this way:

> A. . . . This one involves an individual named [W.G.]. [W.G.] met one of our CIs. They discussed methamphetamine. [W.G.] took the confidential informant to [G.R.]'s residence. [W.G.] acquired the methamphetamine from Mr. R[] and provided it to us for a finder's fee. And that occurred on two occasions.
>
> Q. Okay. And was Mr. R[] also charged in connection with the surge?
>
> A. Yes. Both individuals have been charged.

[10/30/17, 34:16-24] He went on to describe several other transactions.

A. This case involves [N.U], [A.S], and [P.Z]. It began with [N.U] -- the case began with [N.U.] selling methamphetamine to an ATF undercover. [N.U] then took the undercover to [A.S.]. And then later, [A.S.] took the undercover to [P.Z.] for the purchase of meth.

So all three were involved in the methamphetamine trade.

Q. And connected with each other?

A. That is correct.

[B.M.] reported himself a methamphetamine dealer. We purchased some smaller amounts of methamphetamine. Then he brought [R.L.] to meet the undercover, who in turn sold ounce quantities of meth to the undercover.

[10/30/17, 35:1-15] Agent Johnson testified similarly as to twenty-three other instances in which multiple defendants were involved. In each case, initial contact by a confidential informant or an undercover agent led to introductions by the contact with others, often (but not always) previously unknown to the confidential informant or the undercover agent. [10/30/17, 34:16 – 43:15] He went on to state that once the confidential informants and/or undercover agents met with a contact, they would had no influence over the people to whom the contact would introduce them next. He stated,

A. . . . when we meet with somebody, we don't choose who they bring. We don't choose who their source of supply is. We don't choose who they're associated with. You know, they make that decision. They associate with whoever they want to associate with. We have no control over that.

Q. And did you take the conspiracies as you found them?

A. Yes.

Q. So, again, if a conspiracy exists which is either multi-racial or homogenous in terms of race, and you found that conspiracy, what control would ATF have over the racial composition?

A. None.

[10/30/17, 50:17 – 51:4; *see* 10/30/17, 52:13-20]

Of the twenty-six cases involving multiple suspects, fifteen involved a black confidential informant.  [Gov't Exh. 57]  Of these fifteen instances, seven involved one or more black suspects.  [*Id.*]  At the same time, only two of the eleven multiple suspect cases involving non-black confidential informants involved black suspects.  [Gov't Exh. 57]  Similar figures (i.e., the number of cases involving a black confidential informant that also involved a black suspect) was not presented for the twenty-seven other cases.

Taken together, both Agent Johnson's testimony and the figures in Government's Exhibit 57 support Defendants' homophily theory.  Nevertheless, even if the ATF knew of the potential impact of such preferences, this evidence is insufficient on its own to show that the ATF purposefully selected black confidential informants so as to target black people in Albuquerque.  *See Wayte v. United States*, 470 U.S. 598, 610 (1985) (stating, '[D]iscriminatory purpose' ... implies more than ... intent as awareness of consequences.  It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979)).

**b.  Prior Misconduct**

Defendants next argue that ATF's prior "misconduct" is evidence of discriminatory intent.  [Doc. 35, pg. 5]  They maintain that "[e]vidence of ATF's past behavior is highly relevant circumstantial evidence that may be used to infer intent, particularly when many of the agents involved in prior sullied operations were also

involved in the Albuquerque ATF sting that led to [Defendants'] arrest." [Doc. 35, pg. 5] As evidence of "past misconduct," Defendants rely on articles about ATF operations in the past and on cases discussing the "dubious" nature of those operations. [Doc. pgs. 6-14] The Government argues that these past operations are irrelevant to the operation at issue here. [Doc. 32, pg. 9]

Defendants' argument is unavailing. Defendants' request for discovery in this case must be based on evidence related to the ATF's Albuquerque operation, not on actions in other operations. In addition, the surge in Albuquerque differs from the operations addressed by Defendants, which involved undercover storefronts, phony stash houses, and "Operation Fast and Furious." [Doc. 29] The primary tactic that was castigated in the stash house cases as "tawdry" was the dangling of large amounts of money in front of "unsophisticated, and perhaps desperate," defendants. *See, e.g.*, *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011). This tactic was not used here.

**c. Targeted Areas**

Defendants argue that the ATF's confidential informants sought out suspects "in locations that would virtually guarantee netting an inordinate number of minorities – and specifically, Blacks." [Doc. 29] Other than asserting that the neighborhood known as "the Kirk" is a "historically Black neighborhood," Defendants provide no evidence that this is true, or that the area targeted by the ATF includes a higher population of minority residents than other areas. [Doc. 45, pg. 18 (describing the target area as a "minority-concentrated corner of Albuquerque")] Although the Government stated in its *Response* to Defendants' *Motion* that "as many as 19.2 percent of the residents [of zip code 87108,

which the Government states includes the target area] identify as [B]lack," no evidence was submitted to support this figure and the Court was unable to confirm it on the Census Bureau website cited by the Government. [Doc. 32, n. 6; *see also* Doc. 35, n.7] The Court notes that, contrary to both parties' arguments, the population of black residents of the "Southeast/Primary" "crime cluster" identified in the ABQ i-team report admitted by the Government was 5.12% as of August 2017.[3] [Gov't Exh. 58, pg. 38] The "Southeast/Primary" area overlaps with the area targeted by the ATF as stated by Agent Johnson. Defendants' showing as to discriminatory intent based on selection of the target area is insufficient at this time.

### 3. Discriminatory Effect

"To prove discriminatory effect in a race-based selective [enforcement] claim, a defendant must make a credible showing that a . . . similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred." *James*, 257 F.3d at 1179. "The defendant may satisfy [this] requirement by identifying a similarly-situated individual or through the use of statistical evidence." *Id*.

### a. Similarly-Situated Individual

Although the circuits differ in some respects as to how they define a "similarly situated individual," the Tenth Circuit has adopted the Fourth Circuit's formulation: "[D]efendants are similarly situated when their circumstances present no distinguishable

---

[3] The ABQ i-team report also states that the Southeast/Primary area includes 59.41% white residents and 57.97% Hispanic residents of any race.

legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Deberry*, 430 F.3d 1294, 1301 (10th Cir. 2005) citing *United States v. Olvis,* 97 F.3d 739, 744 (4th Cir. 1996). The strictness of this standard is part of what makes selective enforcement claims so difficult to demonstrate, as it "seems to require that defendants be virtually identical (not merely similar) with other unprosecuted individuals. Under [this test], defendants must show that the prosecutor could not have differentiated the defendants from other unprosecuted individuals by using legitimate prosecutorial factors." Thomas P. McCarty, *United States v. Khan, 461 F.3d 477 (4th Cir. 2006): Discovering Whether "Similarly Situated" Individuals and the Selective Prosecution Defense Still Exist*, 87 Neb. L. Rev. 538, 562 (2008); *id.* (stating that "the Fourth Circuit's definition of 'similarly situated' may make it easier for prosecutors to selectively prosecute defendants for invidious purposes."); *United States v. Venable*, 666 F.3d 893, 901 (4th Cir. 2012), *as amended* (Feb. 15, 2012) (stating that the Fourth Circuit has "rejected a narrow approach to relevant factors to be considered when deciding whether persons are similarly situated for prosecutorial decisions." (internal quotation marks and citation omitted)).

At the hearing, Defendants elicited testimony from Agent Johnson regarding a specific investigation in which a confidential informant reported meeting with a white male. [10/31/17, 175:10 – 178:3] After informing the ATF about the white male, Agent Johnson identified the white male and obtained an NCIC report about him. The NCIC report indicated that "he had prior convictions for battery, domestic assault, robbery, assault with serious physical injury, felon in possession of a firearm, and two other

assault convictions." [10/30/17, 176:17-21; Gov't Exh. 30] The white male also had tattoos on his face that ATF agents identified as being associated with two specific street gangs. [Gov't Exh. 30] After the ATF obtained this information, the confidential informant arranged to buy methamphetamine from the white male, but on the day of the sale, the white male did not show up. Although the confidential informant spoke to the suspect again about a purchase, subsequent calls by the confidential informant went unanswered. In a meeting a few weeks later, the confidential informant related to Agent Johnson that he/she had run into the white male and that the suspect had discussed breaking into homes and a robbery in which he beat up a woman. The suspect then told the confidential informant to let him know when the informant had spoken with his/her associate who also committed robberies. [10/31/17, 175:10 – 178:3; Gov't Exh. 30] Agent Johnson testified that the white male was not one of the defendants from the surge. [10/31/17, 178:3]

Agent Johnson also testified about two investigations involving a suspect and a source of supply. In one instance, an ATF agent purchased methamphetamine from a suspect, who identified her source of supply as one of two white males seated in a nearby car. [Def. Exh. I; 10/30/17, 169:6-173:9] Agent Johnson testified that the license plate of the car in which the white males were seated "would have been queried." [10/30/17, 172:18-23] No NCIC report was attached to the Report of Investigation for this transaction and Agent Johnson testified that he did not know if one was obtained. [*Id.*] Agent Johnson stated that neither of the white males in the car was pursued "[b]ecause

they didn't do anything wrong, other than her saying that. There's no evidence that they possessed any meth." [10/30/17, 173:7-9]

In contrast, in another investigation, the black source of supply was arrested even though agents did not observe any transaction between the seller and the source. Agent Johnson testified that an agent met twice with a suspect to purchase methamphetamine. In the first transaction, the suspect directed the agent to an apartment, where an "unidentified black male" was standing outside. Both the suspect and the unidentified black male went into an apartment and the suspect returned and sold methamphetamine to the agent. [Def. Exh. K] On another date, after meeting the agent at a restaurant, the suspect instructed the agent to follow him to the same apartment. Once at the apartment building, the suspect and entered one apartment and shortly came out again. [10/30/17, 193:12-195:22; Def. Exh. K] Agent Johnson testified that a person (later determined to be the same "unidentified black male" as seen in the first transaction) stepped out of the apartment. The "unidentified black male" was later identified through the license plate of the car in front of the apartment, and agents obtained an NCIC report about him. [Def. Exh. K; 10/30/17, 195:11-22] The black male was subsequently arrested and is a surge defendant.[4] [10/30/17, 195:22] Defendants point to the contrast between these two cases as evidence that the ATF agents made decisions to pursue suspects differently based on race. [Doc. 52]

_____

[4] In this instance, the person from whom the methamphetamine was actually purchased was also arrested and is a defendant. [10/30/17, 34:24]

### b. Statistical Evidence

Defendant maintains that he has provided sufficient statistical support for his contention that similarly-situated persons of a different race could have been investigated but were not.  [Doc. 29]  "[A] defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group.  Rather, the proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group."  *James,* 257 F.3d at 1179.  For statistics to be meaningful, they must include "a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population."  *Marshall*, 345 F.3d at 1168 (citations omitted).  A comparison of the percentage of black defendants arrested for a certain crime with the percentage of non-black defendants arrested is significant only if non-black defendants commit that crime at a proportional rate.  In other words, the fact that the percentage of black defendants facing crack possession charges is higher than the percentage of black people in Albuquerque is significant only if it is true that all populations in Albuquerque possess crack at rates proportionate to their population.  For instance, in *United States v. Venable*, the Fourth Circuit rejected the defendant's evidence "showing that for the three years preceding his prosecution—2005, 2006, and 2007—approximately 87 percent of the firearms prosecutions under Project Exile were brought by Black defendants" because it "contain[ed] no appropriate basis for comparison.  It provide[d] no statistical evidence

about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes" and did "not even provide any evidence regarding the proportion of blacks residing within the relevant geographical area."  666 F.3d at 903.

Here, Defendants point to two statistics.  First, the general population of black people in Bernalillo County as of July 1, 2016 was 3.4%.  *See* United States Census Bureau, QuickFacts, *available at* https://www.census.gov/quickfacts/fact/table/bernalillocountynewmexico,US/PST045216 (last visited 02/02/2018).  [Doc. 29, pg. 5]  The Government does not contest this assertion.  [Doc. 32, pg. 12]  Based on an assumption that the proportion of black defendants caught in the surge should be the same as the proportion of black people in the general population, Defendants argue that the fact that 27.2% of the defendants were caught in the surge demonstrates discriminatory effect.  [Doc. 29, pg. 5-6]  However, the Albuquerque operation did not target all of Bernalillo County, or even all of Albuquerque.  Rather, Agent Johnson testified that the ATF targeted "the southeast quadrant" of Albuquerque, which he described as an area stretching from Eubank Boulevard west to San Mateo Boulevard and from Interstate 40 south to Gibson Boulevard.  [10/30/17, 27:8-13]  In addition, this simplistic analysis has been rejected by several courts because there is no evidence for the assumption that all races commit this crime at proportional rates.  *See, e.g.*, *Mesa-Roche*, 288 F. Supp. 2d at 1190 (stating that "the courts have rejected a number of Equal Protection and Fourth Amendment challenges based on assumptions that discrete racial or ethnic groups violate particular

laws at the same rate as other groups" (citing *Armstrong,* 517 U.S. at 469 and *James,* 257 F.3d at 1179–80)).

Defendants also point to statistics from the United States Sentencing Commission on the percentage of black defendants sentenced for drug trafficking and firearms crimes in the District of New Mexico. [Doc. 29, pg. 5; Doc. 29-4 Exh. D] *See* United States Sentencing Bureau Interactive Sourcebook, Primary Offense and Offender Characteristics/Race of Offenders in Each Primary Offense Category, *available at* https://isb.ussc.gov/USSC?userid=USSC_Guest&password=USSC_Guest&toc-section=2 (last visited Feb. 2, 2018). That data shows that black defendants make up 5.4% of drug trafficking defendants and 5.9% of firearms defendants,[5] less than the 27.2% found here. [*Id*.] Defendants argue based on these figures that the percentage of black defendants arrested during the surge should be between 5 and 6 percent. [*Id*.] While this comparison is more specific, it is still problematic for several reasons. First, the District of New Mexico encompasses the entire state of New Mexico. These statistics do not break down or indicate the percentage of black defendants from Albuquerque and more importantly, the area targeted by the ATF. In other words, the statistics cited by Defendants do not indicate whether the persons represented are "similarly situated" to those targeted by the ATF, which were people dealing in drugs or firearms who have violent criminal histories. *See Hare*, 820 F.3d at 99 (rejecting similar statistics); *Olvis*, 97 F.3d at 745 (stating that where the defendants presented a study showing that of "all the federal crack cocaine trafficking prosecutions in federal court since 1992 in which the

[5] Based on data for 2006-2015.

defendant's race was apparent, over 90% involved black defendants," the study was inadequate because it "provide[d] no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes"); *Blackwell v. Strain*, 496 Fed. Appx. 836 (10th Cir. 2012) (rejecting similar statistics offered to show discriminatory intent).

## 4. Analysis

The Court will order the Government to disclose to Defendants at this time only the NCIC reports requested in items 1 and 3 above. *See United States v. Alexander*, No. 11 CR 148-1, 2013 WL 6491476, at *5 (N.D. Ill. Dec. 10, 2013) (allowing "limited discovery of the ATF'a policies and procedures regarding the selection criteria for targets of phony stash-house robbery cases in place at the time of [the defendant's] arrest"). Those requests include 1) NCIC reports generated by ATF for each of the 104 surge defendants, and 2) NCIC reports generated by ATF between March 1, 2016 and September 30, 2016. As Defendants acknowledge [Doc. 45], their showing is insufficient to meet the *Alcaraz-Arellano* standard. However, Defendants maintain that "to ensure a precisely-crafted similarly situated comparison group the defense needs reliable and complete information which currently lies in the hands of the United States." [Doc. 45] They further argue that, with the information known to the ATF at the time of the decision to arrest, a statistician "will be able to run a regression analysis between the defendant class and the [similarly situated comparison group], which can isolate the independent variable (i.e., race, age, sex, criminal history) having the greatest effect on the dependent variable (i.e., the likelihood of being charged in the ATF Surge cases)."

[Doc. 45]  They argue that the results of analysis of the NCIC reports will go to both discriminatory intent and discriminatory effect.  [*Id.*]  *See Alcaraz-Arellano*, 441 F.3d at 1265 (stating that "[i]n some circumstances, '[s]tatistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination.' " *(quoting Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339 n. 20 (1977)).

The Court agrees that Defendants' burden to demonstrate disparate treatment in the face of ATF's criteria for arrest is essentially insurmountable without access to the information ATF had when it made those decisions.  As the *Hare* Court observed,

> [e]ven if a defendant could, for example, use state or federal prosecutions to identify white individuals involved in drug offenses or armed robberies, without discovery into what ATF knew about these individuals, the defendant would be hard pressed to demonstrate that there were no distinguishing factors that would justify different enforcement treatment.

*Hare*, 820 F.3d at 101.

In its objection to release of the NCIC reports, the Government acknowledged that

> "[t]he ATF agent [in a related case] testified that decisions to charge or not charge defendant were made based on criminal history, when it was available.  Thus, if ATF were intending to discriminate against a particular group of people based on race, they would have arrested individuals of that race who had less criminal history than the criminal history of those defendants whom were not being discriminated against based on race.  In other words, ATF would have lowered the arrest threshold for black defendants."

[Doc. 47; *see U.S. v. Casanova*, No. CR 16-2917 JAP, Transcript (taken April 5, 2017), Doc. 51, 78:2-5 (stating that criminal history was key to identifying the "worst of the worst," which were the ATF's targets)]

At the hearing in this matter, Agent Johnson testified that the Albuquerque surge was a "120-day detail where myself and other undercover agents and case agents, along with confidential informants, came into Albuquerque, New Mexico, to help ATF and other law enforcement combat violent crime in the area." [10/30/17, 23:1-5] He also testified that the ATF made decisions to pursue a given target based on a number of factors, including criminal history. He stated,

> There was not an official decision-making process. We'd look at the information that the [confidential informants] would provide. What is this particular individual involved in? Is it firearms? Is it narcotics? We'd look at criminal history; outside factors; talk to local police officers that we worked with as a part of the operation. So there wasn't a hard set, okay, this is the criteria, you've got to check these boxes. It was all on a case-by-case basis, depending on the information we received.

[10/30/17, 29:2-15] Review of the NCIC reports relied on by the ATF in making arrest decisions may allow Defendants to identify whether those not arrested had distinguishing characteristics other than race.

Moreover, the Government's objections to disclosure of the NCIC reports to Defendants boil down to the threat of a breach of privacy and the burden of disclosure. Yet the Government acknowledges that they disclosed to Defendants the Pretrial Services Reports and argues that they contain "contain the known criminal history for the [s]urge defendants of all races." [Doc. 47, pg. 5] Hence, any privacy issues related to disclosure of the criminal history information in those reports is moot. Privacy concerns related to the other NCIC reports can be addressed through a confidentiality agreement.

Finally, the Court notes that the NCIC reports requested have been ordered to be disclosed to a surge defendant in another case. *See U.S. v. Casanova*, No. CR 16-2917 JAP, Doc. 83 (filed 12/13/17).

If, after receipt of the NCIC reports, Defendants can make a showing of discriminatory intent and discriminatory effect that meets the *Alcaraz-Arellano* standard, the Court will consider a renewed motion regarding the remainder of their discovery requests.

## III.    Conclusion

**FOR THE FOREGOING REASONS**, the Court **GRANTS in PART** Defendants' *Motion to Compel Discovery pertaining to Claim of Selective Enforcement.* [Doc. 2362:29; Doc. 2363:28]

**FURTHERMORE**, the parties are ordered to confer regarding the necessity of a confidentiality agreement and, if such an agreement is necessary, to submit a proposed agreement to the Court.

**FINALLY**, the Court and the parties are aware of the requests by members of the press for access to the exhibits admitted at the various hearings in this matter. The Court understands the parties to agree to the release of exhibits, not previously released, upon this Court's ruling on this pending motion. The parties are directed to meet and confer regarding which, if any , as yet unreleased exhibits should be redacted prior to release. Once redacted, the exhibits shall be released. Further concerns relating to this matter should be directed to the Court.

**SO ORDERED this 7th day of February, 2018.**

_____
**M. CHRISTINA ARMIJO**
**Chief United States District Judge**